## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GIBAO EMMANUEL KANI-GOBA,    \*

  Plaintiff,    \*

         \*

v.    \*

         \*   Civil No. 23-2442-BAH

XAVIER BECERRA,    \*

  Defendant.    \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Gibao Emmanuel Kani-Goba brought suit against then-Secretary of Health and Human Services Xavier Becerra ("Defendant"), alleging employment discrimination in violation of Title VII. ECF 1. Pending before the Court is Defendant's motion to dismiss, or in the alternative, for summary judgment. ECF 20. Plaintiff filed an opposition, ECF 26, and Defendant filed a reply, ECF 29. All filings include memoranda of law, while the complaint and Defendant's motion include exhibits.[1] In addition, Plaintiff has filed a "motion to postpone." *See* ECF 30. The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's motion will be GRANTED, while Plaintiff's motion to postpone will be DENIED.

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page. Plaintiff filed two "supplements" to his complaint. See ECF 5 (filed October 2, 2023); ECF 16 (filed February 20, 2024). Both supplements contain documents Plaintiff purports to be related to his claims.

## I.   **BACKGROUND**[2]

This action arose out of Plaintiff's tenure as an employee of the National Institutes of Health ("NIH"), where he notes that he worked as a "contract specialist" at the GS-13 level from July 2020 to May 2022. ECF 1-1, at 1. Plaintiff states that he is "African American" and that his national origin is "Sierra Leonean." *Id.* at 19.

When Plaintiff began working at the NIH, his immediate supervisor was an employee named Jennifer Reed. ECF 1-1, at 1. At the beginning of his tenure, a date Plaintiff refers to as "the day of taking the oath," Plaintiff also met Clarion "Pete" Miller; Plaintiff reports that upon meeting, Miller "murmured some words to [Reed]" and then said to Plaintiff, "good luck." *Id.* Thereafter, Plaintiff's only interactions with Miller and Reed occurred over "teleconferencing," as Plaintiff worked from home. *Id.*

During the time Plaintiff was supervised by Reed, Plaintiff used Skype to contact his colleagues. ECF 1-1, at 1. Plaintiff indicates that Skype was "fairly new" to him. *Id.* One day early in the course of Plaintiff's employment, his government-issued computer mouse malfunctioned, and he stepped away from his monitor at lunch to purchase a new one. *Id.* Plaintiff indicates that he then received a call from Reed, who stated that "she had checked Plaintiff's status" on Skype and noticed that Plaintiff had "logged off." *Id.* Though Plaintiff informed Reed that he was going to buy a new external mouse, he "decided to cancel buying the mouse and waited until after work." *Id.* Plaintiff indicates that he reported this "incident" to Reed's supervisor, who responded, "if you think this is not a good fit, I can write you a letter of recommendation so you can go somewhere else." *Id.* After the exchange with Reed, Plaintiff reports that he only "sporadically would log on" to Skype "but was still communicating with customers and effectively

---

[2] The Court notes that the complaint is, to be mild, difficult to decipher. The Court does its best to untangle the allegations in this section.

doing his work." *Id.* In September 2020, Reed issued Plaintiff with a written reprimand for failing to follow instructions regarding the use of Skype, but Plaintiff indicates that he only received the "policies" on the use of Skype after Reed reprimanded him. *Id.* Plaintiff filed an "EEO complaint with counselor Chinara Brown" about the incident but reports that it was "swept under the rug." *Id.* at 2. There is no detail in the complaint about what issues Plaintiff raised in this EEO complaint.

In December 2020, Reed completed Plaintiff's Performance Management Approval Program ("PMAP") evaluation and rated him at a Level 3. ECF 1-1, at 2. Reed informed Plaintiff that he had received this rating in part because he "had taken a whole month of vacation to visit his ailing dad." *Id.* Plaintiff notes that he informed another NIH employee that his evaluation results were motivated by "retaliation"[3] on Reed's part. *Id.*

Reed left the NIH in early 2021. ECF 1-1, at 2. Before her departure, her team was consolidated with Miller's, and Miller became Plaintiff's new supervisor. *Id.* During an on-line meeting before Reed's departure, Miller and Reed began discussing one of Plaintiff's contracts, and Reed asked Miller to "mute" Plaintiff's "mic" during the on-line video discussion. *Id.* Plaintiff alleges that he "protested" the conversation between the Miller and Reed and asked "whether there was a conspiracy" against him. *Id.* Plaintiff reported this incident to Miller and "Kala," presumably Director Kala Shankar, "but no action was taken." *Id.*

Plaintiff characterizes his working relationship with Miller as "corrosive and hostile" from "the starting point." ECF 1-1, at 2. Plaintiff identifies a February 2021[4] email exchange with

---

[3] Plaintiff does not explain what conduct Reed was retaliating against Plaintiff for, though the complaint can be generously read to assume the retaliation was for Plaintiff's filing of the EEO complaint noted above.

[4] The complaint provides both 2020 as the year in which this conversation took place, *see* ECF 1-1, at 2, but Plaintiff notes in his reply that the incident occurred in 2021, *see* ECF 26, at 21. As

Miller as the root of the issues between the two. *Id.* At that time, Plaintiff had sent out a report on a particular area of federal contracting to the whole team, but Miller disagreed with Plaintiff's analysis. *Id.* Per Plaintiff, Miller took the discussion "very personal[ly]," as apparently evidenced by the fact that Miller referred to the exchange again in a "heated telephone call" with Plaintiff months later in May 2021. *Id.* Plaintiff reports that Miller stated he felt Plaintiff had "challenged" him. *Id.*

On March 15, 2021, Plaintiff attempted to file a sick leave request so he could take his wife to a doctor's appointment. ECF 1-1, at 2. Plaintiff indicates that he was "very new to the agency" and so inadvertently submitted the request as "general leave" instead of sick leave. *Id.* He also reports that he logged off between five and ten minutes in advance of the requested leave start time so he could use the restroom. *Id.* The following day, Miller called Plaintiff to inquire about his whereabouts and the reasons for the leave request. *Id.* Miller followed up again by email the next week and again asked why Plaintiff appeared inactive on Skype and why Miller could not reach Plaintiff over the phone. *Id.* at 2–3. According to Plaintiff, he was mindful of how his "former supervisor had used Skype as an ankle bracelet" and so only told Miller that "it would be a [HIPAA] violation to disclose" the details of Plaintiff's wife's appointment. *Id.* at 3. Plaintiff reports that, after this conversation, Miller threatened him and once called him "gangster" during a team meeting. *Id.* As his working relationship with Miller was "deteriorating," Plaintiff "complained" to his union representative," who replied that she "could only ask Plaintiff to leave" because, "in her words, 'these people don't like you.'" *Id.*

---

the complaint specifies that Plaintiff began working at the NIH only in July 2020, *see* ECF 1-1, at 1, the Court will presume that the 2021 date is the correct one.

Plaintiff and Miller apparently continued to clash. Plaintiff reports that Miller "subjected" him to "all sorts of condescending comments" and told him, "you are not fit to be a GS-13." ECF 1-1, at 3. Plaintiff further notes that, while he was "met with Skype messages" if he had "bad connectivity" and could not join team calls, "[c]onversely, it was noticed on several occasions that some of Plaintiff's White co-workers were asked to be called to join the meeting." *Id.* According to Plaintiff, Miller was trying to "purge African Americans from [Miller's] team." *Id.* at 6.

On June 21, 2021, Miller placed Plaintiff on a "Performance Improvement Plan" ("PIP") and denied Plaintiff's request for a "WIGI" (within-grade increase) on the grounds that Plaintiff's work was deficient. ECF 1-1, at 3–4. Plaintiff reports that no other team member was denied a WIGI or placed on a PIP "because of errors found on work products[.]" *Id.* at 22.

A month into the PIP period, in July of 2021, Miller met with Plaintiff to discuss his mid-year progress. ECF 1-1, at 4. Miller did not provide Plaintiff with a rating at this time. *Id.* Plaintiff indicates that Miller "never followed" relevant guidelines in evaluating Plaintiff's performance. *Id.* Moreover, Plaintiff took issue with the caveat Miller included in the PIP, which stipulated that "should [Miller] determine[] Plaintiff's performance to again fall to [ ] Level 1[,] [Miller] would have to propose Plaintiff's removal." *Id.* at 5. Plaintiff characterizes this caveat as motivated by Miller's dislike of Plaintiff, stemming from the February 2021 email exchange. *Id.* Moreover, Plaintiff generally understands Miller's rationale for implementing the PIP as motivated by "malice," as Miller "himself acknowledged that Plaintiff had not done the type of work that was done on [Miller's] team" and therefore Miller had no legitimate reason to bring up the "alleged errors" in the PIP. *Id.* Plaintiff also ascribes "malice" to Miller's rating of Plaintiff's performance at a Level 1 in the PIP, as Reed had rated Plaintiff at a Level 3 and "only when Plaintiff came to [Miller's] team" did his performance rating fall. *Id.*

5

At the end of July 2021, Miller completed a new PMAP for Plaintiff. ECF 1-1, at 6. According to Plaintiff, Miller waited until the end of the day to submit the PMAP to Plaintiff for signing because Miller "knew that Plaintiff was going to rebut [ ] his lies." *Id.* Plaintiff reports that he did not have time to sign the document because it was presented to him at the end of the work day but Miller "manipulat[ed] the system" to claim that Plaintiff had "refused" to sign. *Id.* On July 27, Plaintiff contacted an EEO counselor at the NIH to complaint about Miller's behavior. ECF 1, at 5.

Plaintiff successfully completed the PIP period in August of 2021. The following month, in September 2021, issues arose regarding, in Plaintiff's words, "allegations for comments that could not be substantiated but [were] aimed at ousting Plaintiff." *Id.* at 6. Though the complaint is not entirely clear on specifics, the issue stemmed from a mediation involving Plaintiff and Miller, occurring on or about September 27, 2021, in which Plaintiff made a comment that Miller took to be a threat to "cut off" Miller's head. *Id.* at 19. Plaintiff alleges that he did not intend to make a threat to injure or kill Miller and relayed as much to Kathy Eastberg, who appears to be a member of the NIH's human resources department.[5] *Id.* Regardless, a few days later, Plaintiff

---

[5] Plaintiff claims during a discussion about the likelihood of having "negative information removed from Plaintiff's file," he said ". . . but things like this could get people's head chopped off." ECF 1-1, at 6. However, Plaintiff admits that his "comments may have not come out the way that it was intended . . . ." *Id.* Documents attached to Plaintiff's complaint detail Miller's side of the exchange. In an email from Miller to Heather Ramiah, Miller describes the September 28, 2021 mediation involving Plaintiff, Miller, and a mediator. ECF 1-11, at 1. Near the end of the session, Miller reports that Plaintiff said "'that if [Plaintiff] were in [Plaintiff's] country . . . [Plaintiff] would chop off [Miller's] head." *Id.* In a Skype chat between Miller and Eastberg, who was apparently also listening to the mediation, Miller asked Eastberg if "[Plaintiff] just [said] he was going to chop of [Miller's] head?" ECF 1-12, at 1. Eastberg responded by stating:" That is what I thought I heard. I did ask [Plaintiff] to clarify what he said. He is angry and was venting. I hope." *Id.* Plaintiff also attaches an email from Miller to Susie Pham, another NIH employee, in which he reports "an unsettling event" that occurred during mediation. ECF 1-12, at 2. Miller describes the incident as Plaintiff stating that Miller "was racist and 'that he would cut off my head.'" *Id.*

met with Leona Bedrossian, an EEO counselor, "due to his still pending EEO claim." *Id.* at 20.

Bedrossian apparently confirmed that Plaintiff made a comment related to "chop[ping a] person's

head off."[6] *Id.* at 14.  Plaintiff indicates that this comment was "not literal" but that Miller "tried

to [coerce] Kathy Eastberg into accepting or concurring with him that Plaintiff had threatened to

cut off his head." *Id.* at 6.

On October 21, 2021, Plaintiff filed a formal EEO complaint against the NIH.  ECF 1, at

5.  On November 15, 2021, Plaintiff was placed on administrative leave.[7]  ECF 1-1, at 18.  Contrary

to what Plaintiff understands to be his former colleagues' recollection of the comment, Plaintiff

avers that he never said anything to the effect of, "[I] am so angry, [I] could chop someone's head

off." *Id.* at 14.  Instead, Plaintiff seeks to clarify, he was expressing his frustration with

"discriminatory treatment" and stated generally "that things like this get people['s] heads chopped

off." *Id.* at 19.

Sometime after Plaintiff was placed on administrative leave, he filed suit before an

administrative law judge ("ALJ").  ECF 1-1, at 7.  According to Plaintiff, the ALJ "refused to

admit into evidence [ ] the report of 'retaliation' made to [a] EEO investigator" and further refused

to "grant [ ] Plaintiff the right to seek discovery[.]"  *Id.*  Plaintiff construes these refusals as

indicators that the ALJ did not treat him "fairly." *Id.*  Further, Plaintiff appears to indicate that the

ALJ misunderstood the timeline of the events and so arrived at an incorrect conclusion. *Id.* at 8.

---

[6] In an attachment to the motion, Defendant includes a copy of an email summarizing the results
of the NIH's internal investigation into the comments.  The email clarifies that Plaintiff first made
the comment at issue in a pre-EEO mediation session held on September 27, 2021 between
Plaintiff, Miller, Eastberg, and mediator Kevin Savidge.  ECF 20-17, at 2.  The email also notes
that Plaintiff reiterated the comment during his interview with Bedrossian on October 5, 2021. *Id.*

[7] Though the exact timing is not clear from the complaint, Plaintiff suggests that the leave was
implemented some weeks after he made his comments. ECF 1-1, at 18.  Documents attached to
Defendant's motion confirm that Plaintiff's suspension began on November 15, 2021. *See* ECF
20-2, at 3.

Plaintiff argues that there is clear evidence that Miller implemented the PIP in "direct retaliation" for Plaintiff's "protected activity," which he identifies as the "reports about [Miller]" he made to Miller's superiors. *Id.* at 9. Plaintiff also suggests that he engaged in activity covered by the Whistleblower Protection Act, as he "sought to have exposed [Miller's] treatment of African Americans under his supervision, and by extension, the NIH Office of Research Facilities." *Id.*

## II.  **LEGAL STANDARD**

When presented with a motion to dismiss or, in the alternative, a motion for summary judgement, the disposition of the motion "implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions their motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).

8

Ordinarily, a party opposing the conversion of a motion to dismiss into one for summary judgment must submit a Rule 56(d) affidavit setting forth their reasons, and the Fourth Circuit places "great weight" on the necessity of such an affidavit. *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). However, failure to file a Rule 56(d) affidavit does not necessarily doom a party's opposition to conversion, and a court may consider whether the nonmoving party has "adequately informed the [ ] court that the motion [for summary judgment] is [premature] and more discovery is necessary." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Here, Plaintiff has not filed a Rule 56(d) affidavit. Plaintiff titles his response brief "response to Defendant's motion to dismiss or summary judgment," indicating that he was aware of the possibility that the motion could be converted into one for summary judgment. ECF 26, at 1. Moreover, Plaintiff appears to articulate the arguments of his response in line with the summary judgment standard, suggesting that he agrees the Court should convert the motion to dismiss into one for summary judgment. *See id.* at 27. However, he also seems to suggest that discovery has been inadequate. *See id.* at 3. Because Plaintiff brings this suit pro se, the Court must liberally construe his pleadings, holding them to a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). This leniency has its limits, though. "A court may not construct the plaintiff's legal arguments for him, nor is a district court required to recognize 'obscure or extravagant claims defying the most concerted efforts to unravel them.'" *Runge v. Barton*, Civ. No. 6:08-0231, 2009 WL 3245471, at *1 (D.S.C. Oct. 2, 2009) (first citing *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993), then quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1277 (4th Cir. 1985), *aff'd*, 368 F. App'x 361 (4th Cir. 2010)).

Even under the more lenient standard afforded to pro se plaintiffs, the Court determines that Plaintiff has not shown that further discovery is necessary. Plaintiff himself admits that discovery has, in fact, taken place, *see* ECF 26, at 11, and though he argues that Defendant should produce further "work product discovery," he does not provide a rationale for why these additional documents would be necessary, *id.* at 15. The Court will therefore treat Defendant's motion as one for summary judgment. *Cf. Neath v. Austin*, Civ. No. AAQ-21-1580, 2023 WL 2391959, at *3 (D. Md. Mar. 6, 2023) (determining that a motion to dismiss could properly be converted into one for summary judgment where the nonmoving party "failed to make an adequate showing of the necessity of further discovery").

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

### III.   ANALYSIS

Plaintiff enumerates two claims under Title VII: "discrimination and retaliation on the basis of race" and "disparate treatment on the basis of race."[8]  ECF 1-1, at 5.  The Court considers each in turn.

#### A.   Retaliation

"Title VII [ ] bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (2020) (citing 42 U.S.C. § 2000e-3).  "A Title VII retaliation claim may be established through direct evidence of retaliatory intent" or through a burden-shifting framework. *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 178 (D. Md. 2022).  Under this framework,

> [A] plaintiff bears the initial burden of establishing a prima facie case of retaliation.  Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action.  If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext.

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  "A prima facie case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) [they] suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018) (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)).

---

[8] Defendant also reads Plaintiff's complaint as encompassing a hostile work environment claim. *See* ECF 20-1, at 19–20.  However, Plaintiff does not specify such a claim, and indeed in his response expressly does not "dispute" Defendant's contention that Plaintiff cannot sustain a hostile work environment claim. ECF 26, at 20.  The Court therefore does not include the putative hostile work environment claim in its analysis.

### 1. Defendant shows, and Plaintiff does not rebut, that the administrative leave was not retaliatory

Defendant disputes that Plaintiff can satisfy either the second or the third prong of the above test, on the grounds that administrative leave is "not an adverse employment action under Title VII" and that Plaintiff's complaint does not indicate that Miller was "aware of [the] alleged complaint." ECF 20-1, at 15, 18. In response, Plaintiff affirms that a "forced absence, even if paid" is still a "materially adverse action" because it "prohibited" him from working "and thereby prevented [him] from 'opportunities to gain job experience.'" ECF 26, at 17 (quoting *United States ex rel. Herman v. Coloplast Corp.*, 295 F. Supp. 3d 37, 43 (D. Mass. 2018)).

As an initial matter, the Court must consider whether administrative leave constitutes an "adverse employment action" under Title VII. While Plaintiff has identified a case from another circuit in support of his argument that administrative leave is, indeed, an adverse employment action, the Fourth Circuit has previously held the opposite. *See Nzabandora v. Rectors & Visitors of Univ. of Va.*, 749 F. App'x 173, 175 (4th Cir. 2018)). The Fourth Circuit's decision in *Nzabandora* relied on *Jones v. Southeastern Pennsylvania Transportation Authority*, which established that because a paid suspension did not effect a "serious and tangible alteration of the terms, conditions, or privileges of employment," it could not be an adverse action for Title VII purposes. 796 F.3d 323, 326 (3d Cir. 2015) (internal quotation omitted).

However, the Supreme Court's recent decision in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024) casts doubt on whether such a conclusion is still valid. In *Muldrow*, the Court found that a Title VII plaintiff need not show "significant employment disadvantage" to prevail but only "some injury respecting her employment terms or conditions." 601 U.S. at 359. Though *Muldrow* specifically addressed transfers as an adverse retaliatory action, lower courts around the country have recognized that *Muldrow*'s holding may extend to paid administrative leave as well.

12

*See Russo v. Bryn Mawr Tr. Co.*, Civ. No. 22-3235, 2024 WL 3738643, at *4 n.3 (3d Cir. Aug. 9, 2024) (recognizing that *Muldrow* "arguably abrogated" *Jones*, 796 F.3d 323, "so that a suspension with pay might, under some circumstances, constitute an adverse employment action"); *Smith v. Crittenden Cnty., Ark.*, No. 3:22-CV-00042, 2024 WL 2194847, at *12 n.178 (E.D. Ark. May 15, 2024) (noting that prior Eighth Circuit cases suggesting suspension with pay is not an adverse action are "unlikely" to "survive *Muldrow*"); *Kemper v. City of Jackson, Tenn.*, No. 1:22-CV-02689, 2025 WL 336211,.at *5 (W.D. Tenn. Jan. 24, 2025) (determining that, post *Muldrow*, placement on paid administrative leave could represent an adverse action where it resulted in "significant professional restrictions"). In light of these developments, the Court cannot categorically agree with Defendant's argument that paid administrative leave does not constitute an adverse action.

Even if suspension does represent an adverse employment action, it is a close call whether Plaintiff has sufficiently established the other elements of a prima facie case of retaliation. With respect to the first prong, is true that Plaintiff does offer some general suggestions that he may have been retaliated against for lodging an EEO complaint. For example, he notes that after he was cited for failing to sign the PMAP, he was "left with no alternative to file an EEO complaint against [Miller]." ECF 1-1, at 4. He describes this complaint as one reporting that Miller "attempt[ed] to purge African Americans from his team." *Id.* at 6. Plaintiff later alleges that the complaint "sought to have exposed [Miller's] treatment of African Americans under his supervision, and by extension, the NIH Office of Research Facilities." *Id.* at 9. He further contends that at his mediation he "was asked about his pending EEO complaint and the trials and tribulations he endured, in having his claims heard as a result of the discriminatory treatment he was feeling in the department as a result of his race (African American) and national origin (Sierra

13

Leonean)," which implies that the complaint alleged some sort of discrimination on the part of Miller. *Id.* at 19. Though his description of the EEO complaint against Miller is admittedly vague, the Court is mindful of the fact that "informal complaints about discriminatory treatment relating to a protected status constitute protected activity under Title VII . . . ." *Volochayev v. Sebelius*, 513 F. App'x. 348, 354 (4th Cir. 2013) (internal citation omitted). Thus, the Court will assume that Plaintiff's reference to his race as it relates to his EEO complaints makes it such that he has sufficiently alleged that he engaged in protected activity.

The question of causation is also thorny. A review of the record shows that Plaintiff made initial contact with an EEO counselor on July 27, 2021 and filed a formal complaint of discrimination on October 21, 2021. *See* ECF 1, at 5. *Id.*; *see also* ECF 20-2, at 3. As to the date of the suspension, while Plaintiff's complaint is not specific, the NIH's internal EEO investigation report indicates that the leave period began on November 15, 2021. *See* ECF 20-2, at 3. The time between Plaintiff's EEO contacts and the beginning of his administrative leave is significant, as plaintiffs claiming retaliation often "point to a temporal connection to support an inference of a causal link between their protected activity and an adverse action, with shorter time periods giving rise to a stronger inference." *Peterson v. Capital One, N.A.*, 705 F. Supp. 3d 484, 498 (D. Md. 2023) (internal citations omitted). The Fourth Circuit has determined that "a lapse of two months between the protected activity and the adverse action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). Here, close to three months had elapsed between the time Plaintiff initially raised an issue with the NIH's EEO office and the beginning of his administrative leave on November 15. However, the distance between the date of Plaintiff's leave and the date he filed the official complaint, October 21, is

14

considerably shorter.   Accordingly, drawing all inferences in favor of Plaintiff, the Court determines that this brief period of time between Plaintiff's filing of the formal complaint and his suspension supports an inference of retaliation.   Plaintiff has therefore established a prima facie case of retaliation.

Nevertheless, the Court's analysis does not stop there.   As noted, if a plaintiff makes a prima facie case for retaliation, the burden then shifts to the defendant "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250.   Here, Defendant contends that the NIH placed Plaintiff on administrative leave for a legitimate reason, namely in order to "conduct[] an investigation into his threatening statements." ECF 20-1, at 24.   In support of this argument, Defendant cites to the notice of administrative leave provided by the NIH to Plaintiff, which articulates the same rationale.   *See* ECF 20-2, at 639. Defendant also includes an October 2021 email thread between members of the NIH's human resources office, which demonstrates that the NIH contemplated placing Plaintiff on administrative leave as a result of the "threat" Plaintiff made during his EEO interview.   *Id.* at 637–38.   In that same email thread, the human resources team proposed and planned a policy banning Plaintiff from the NIH's campus, further evidencing a concern over potential safety issues stemming from Plaintiff's comment. *Id.* at 636–37.

The NIH's actions here may be analogized to the facts at issue in *Faulkenberry v. U.S. Dep't of Def.*, 670 F. Supp. 3d 234 (D. Md. 2023).   In *Faulkenberry*, the plaintiff was placed on administrative leave after she remarked that management "would have a bad day on Monday" as a result of her filing a complaint of discrimination.   *Id.* at 246.   Though the *Faulkenberry* plaintiff argued that she had been suspended in retaliation for making the complaint, the court disagreed, and found that the plaintiff failed to show her "protected conduct to be [the] cause" of her

suspension. *Id.* at 260.  Because her employer's decision was "perfectly reasonable" given the context of the perceived threat, the plaintiff could not sustain her claim of retaliation. *Id.*

Though the facts of *Faulkenberry* and the facts at issue here do not perfectly overlap, the parallel is still instructive.  Moreover, though the *Faulkenberry* court found that the plaintiff's military background was relevant context for the threat, and Plaintiff does not appear to have such a history, the comment at issue in the instant case is arguably more serious, and certainly more vivid, than the one made in *Faulkenberry*.  While the *Faulkenberry* plaintiff had said generally that management "would have a bad day on Monday," Plaintiff admits in his own words that he told a coworker "things like this could get people's head chopped off" in response to his perceived discriminatory treatment.  ECF 1-1, at 19.  Though Plaintiff avers that the "expression was not directed to any particular person" and "no one was mentioned by name," *id.*, the same was true of the *Faulkenberry* plaintiff's remark, which was made generally and was not targeted.  *See Faulkenberry*, 670 F. Supp. 3d. at 246.  Moreover, Plaintiff himself acknowledges that his notice of suspension explicitly referenced the comment as grounds for instituting administrative leave. ECF 1-1, at 14.  Though Plaintiff appears to identify the comment as "protected" under Title VII, *see id.* at 20, the result in *Faulkenberry* suggests that this position is untenable.[9]

Following *Faulkenberry*, this Court has previously concluded that an employer provided a "legitimate, non-retaliatory rationale" for a plaintiff's placement on administrative leave where

---

[9] *See also Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise."); *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1141 (11th Cir. 2020) ("[E]ven if an employee's oppositional conduct does not interfere with the employee's performance of her own duties, it can still . . . lose its protected status [] if the opposition is expressed in a manner that unreasonably disrupts other employees or the workplace in general.").

plaintiff "made inappropriate comments against his supervisor that were perceived as threatening" and was thereafter suspended. *Downer v. Prince George's Cnty. Bd. of Educ.*, Civ. No. BAH-21-1618, 2024 WL 3277563, at *20 (D. Md. July 2, 2024). For the reasons stated above, the Court finds that such a finding is warranted in the case at hand, too. Accordingly, the Court concludes that Defendant has offered a non-retaliatory rationale for placing Plaintiff on administrative leave.

Plaintiff fails to show that this rationale is pretextual. While Plaintiff argues that he was placed on leave "on a pretext of relieving [him] from his position based on an egregious, frivolous[,] and 'fake' claim for comments made that [he] had clarified," he offers no evidence to support this position. ECF 26, at 17. Once an employer has proffered evidence of a legitimate, non-retaliatory reason for an adverse employment action, a plaintiff must offer "*proof* at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action." *Foster*, 787 F.3d at 252 (emphasis added). Plaintiff has offered no such proof beyond his own conclusory assertions, which are insufficient to generate a genuine dispute of material fact. *See* ECF 26, at 20 (merely alleging that the NIH's evaluation of the comment as a threat was "frivolous and baseless" but without citing supporting facts). Defendant is therefore entitled to summary judgment.

2. Plaintiff does not show that the WIGI denial and the PIP were retaliatory

In addition to his claim regarding placement on administrative leave, Plaintiff also appears to suggest that Miller's imposition of the PIP and denial of the WIGI likewise constituted adverse employment actions. *See* ECF 1-1, at 12. To the extent that Plaintiff does advance this claim, it, too, fails. It is true that placement on a performance improvement plan may constitute an adverse employment action in some circumstances. *See Hanson-Hodge v. Kijakazi*, Civ. No. BAH-22-2818, 2023 WL 8357322, at *12 (D. Md. Dec. 1, 2023), *appeal dismissed sub nom. Hanson-Hodge v. O'Malley*, Civ. No. No. 24-1123, 2024 WL 4262745 (4th Cir. Sept. 23, 2024). Denial of a

17

within-grade increase may also represent an adverse action. *See Terveer v. Billington*, 34 F. Supp. 3d 100, 119 (D.D.C. 2014). However, Plaintiff has not, and indeed seemingly cannot, show causation between his EEO complaint and Miller's WIGI and PIP decisions. The record evidence suggests that Plaintiff first contacted an EEO officer on July 27, 2021. ECF 1, at 5 and ECF 20-2, at 3. This was over a month after Miller had denied Plaintiff's WIGI request and placed him on a PIP, events that occurred on June 21, 2021. *See* ECF 1-8, at 1, ECF 1-9, at 1. As Plaintiff initiated his EEO complaint at a later point in time than Miller issued the WIGI and PIP notices, a "causal link" between the two is temporally impossible and so Plaintiff cannot make a prima facie claim for retaliation on this basis.

Even if there was some causal connection, Plaintiff's allegation that Miller instituted the PIP and denied the WIGI out of general "malice" is not actionable under Title VII. ECF 1-1, at 5. Plaintiff ascribes this "malice" to his February 2021 dispute with Miller over contract language and Miller's feeling that Plaintiff "challenged" him during that conversation, *id.*, but Title VII "does not mandate civility in the workplace." *Strothers v. City of Laurel, Md.*, 118 F. Supp. 3d 852, 864 (D. Md. 2015). "Incidents that cause bruised or wounded feelings, such as 'rude treatment,' 'callous behavior,' 'routine difference of opinion,' or 'personality conflict[s]' are not cognizable under Title VII." *Glanville v. Mayor & City Council of Balt.*, Civ. No. EA-23-3395, 2024 WL 5264381, at *11 (D. Md. Dec. 31, 2024) (quoting *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008)). Plaintiff offers no facts to suggest that the February 2021 dispute was anything other than a "heated" conversation. ECF 1-1, at 2. As such, any steps that Plaintiff infers Miller took in response to the dispute cannot be attributed to Plaintiff's engagement in protected conduct and so cannot form the basis for a Title VII retaliation claim.

### B.    Disparate Treatment Discrimination

Title VII provides that an employer may not "discriminate against any individual with respect to [ ] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  A plaintiff bringing a Title VII discrimination claim may "demonstrate through direct or circumstantial evidence that discrimination motivated the adverse employment action." *Rorie v. Bd. of Educ. of Charles Cnty.*, 653 F. Supp. 3d 217, 230 (D. Md. 2023).  In instances where, as here, a plaintiff does not provide direct evidence, a discrimination claim proceeds according to the framework announced by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* approach, a plaintiff must first establish a prima facie case of discrimination before the burden shifts back to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Id.* at 802.  The burden then shifts again to a plaintiff to show that the employer's proffered reasons are pretextual. *Id.* at 804.  While this avenue of proof may be established at trial, it is also applicable at the summary judgment stage, where a plaintiff may survive summary judgment on a discrimination claim by following the *McDonnell Douglas* framework. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019); *see also Pettis v. Nottoway Cnty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014).

"[T]he elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)).  Here, Plaintiff's discrimination claim appears to rest on his contention that while he surmises other employees made mistakes, no one else on the team "was denied a WIGI or placed

19

on a PIP or [ ] sanctioned." ECF 1-1, at 22. Defendant argues that Plaintiff has failed both to establish a prima facie case of discrimination and to rebut the NIH's "legitimate, business reasons" for placing Plaintiff on a PIP and then on administrative leave. ECF 20-1, at 20–21.

Defendant argues that Plaintiff cannot make a prima facie showing of discrimination principally because he cannot show satisfactory job performance at the times relevant to his claims, that is, when the PIP was instituted and when he was put on administrative leave. ECF 20-1, at 23. The Court agrees and finds Plaintiff has not offered relevant facts to support an inference that he was meeting performance expectations.[10] Satisfactory job performance may be shown through "unbiased factual . . . assertion[s] that [plaintiff] was meeting [defendant's] legitimate expectations as an employee." *Jeffries v. Wal-Mart Stores E.*, Civ. No. GJH-15-473, 2016 WL 3771241, at *5 (D. Md. July 11, 2016), *aff'd sub nom. Jeffries v. Wal-Mart Stores E., L.P.*, 669 F. App'x 634 (4th Cir. 2016). Plaintiff offers no such facts here.[11] Because a plaintiff's "own opinions about [their] job performance, without more, [are] insufficient to show satisfactory performance in connection with [ ] employment discrimination claims," the Court determines that Plaintiff has not established satisfactory work performance and thus cannot establish a prima facie case of discrimination. *Conteh v. Diversified Prot. Corp.*, Civ. No. LKG-20-3032, 2022 WL 874937, at *7 (D. Md. Mar. 24, 2022).

---

[10] Plaintiff does assert in his complaint that he had received a performance appraisal rating of 3, indicating satisfactory performance, in December 2020, before joining Miller's team. ECF 1-1, at 2. However, this claim is irrelevant. "Even if [a] plaintiff's performance under [one supervisor] [was] considered [ ] to be satisfactory, it does not necessarily follow that plaintiff's performance was satisfactory under [a second supervisor]." *Pfeifer v. Lever Bros. Co.*, 693 F. Supp. 358, 364 (D. Md. 1987). The relevant perspective is that of the "decision maker" at the time of the adverse action, "not the self-assessment of the plaintiff" or other, previous perceptions of the employee's performance. *Evans*, 80 F.3d at 960–61.

[11] Indeed, in response to Defendant's motion, Plaintiff acknowledges the deficiencies in his work, though he also argues that such errors occurred because he was "new to the team" and "had not done the type of work he was faulted for." ECF 26, at 20.

Even if Plaintiff had established a prima facie case, Defendant would still be entitled to summary judgment. As discussed above, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's placement on administrative leave, namely, the comments which Miller and other NIH staff perceived as threatening, ECF 20-1, at 24, and Plaintiff fails to rebut this rationale. Moreover, Defendant has also provided a legitimate, non-discriminatory reason for Plaintiff's placement on the PIP and on administrative leave, and Plaintiff has not provided any evidence to rebut this rationale, either. Defendant offers substantial evidence to show that Plaintiff's work did not meet expectations. For example, the PIP notice appended to Defendant's motion cites, *inter alia*, Plaintiff's lack of understanding of agency procedure, repeated instances of numerous and "fundamental" errors in draft contract submissions, failure to respond to customer and manager inquiries, and failure to abide by proper protocol for release of contract proposals as grounds for the implementation of the plan.[12] ECF 20-2, at 138–42. Additionally, email threads also attached to the motion reflect that Plaintiff failed to address Miller's recommended changes in certain documents, *id.* at 173; did not update or correct the information in a tracking record, *id.* at 174; and included inapplicable clauses in contract drafts, *id.* at 180.

In the face of this evidence, Plaintiff responds that the PIP was a "pretext" for his removal and that the cited infractions were not "accurate." ECF 26, at 9. However, he again fails to provide any facts which would support these conclusory statements. This sort of "unsupported speculation is insufficient" to overcome summary judgment. *Evans*, 80 F.3d at 960. "Merely denying the veracity of the employer's stated reason does not relieve plaintiff of [his] burden of proof." *Hart v. Broadway Serv., Inc.*, 899 F. Supp. 2d 433, 443 (D. Md. 2012) (quoting *Bray v. Tenax Corp.*, 905 F. Supp. 324, 329 (E.D.N.C. 1995)) (alteration in *Hart*). Instead, Plaintiff must prove "by a

---

[12] Plaintiff appends this same document to his complaint. *See* ECF 1-9.

preponderance of the evidence" that Defendant's reasons were pretextual. *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 444 (D. Md. 2022) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Because Plaintiff does not present any evidence, he cannot meet his burden of rebutting Defendant's nondiscriminatory rationales for the implementation of the PIP, denial of the WIGI request, and placement on administrative leave and he fails to show that there is a genuine issue of material fact. Defendant is therefore entitled to summary judgment on Plaintiff's disparate treatment discrimination claim.

### C.    Motion to Postpone

On August 6, 2024, after Defendant's motion became ripe, Plaintiff entered a motion to "postpone this matter" on the grounds that a related administrative proceeding was scheduled to take place in September 2024. ECF 30, at 2. Plaintiff explains that he had originally attempted to pursue his claims through administrative channels but was frustrated by "extensions of time" and what he calls Defendant's "mere refusal to comply" with discovery. *Id.* at 1. Due to the lapse in time, Plaintiff says, he had to withdraw an appeal made to the Merit Systems Protection Board but subsequently refiled the case on March 21, 2024. *Id.* It is this refiled appeal that Plaintiff cites as grounds for postponing the instant case, reasoning that resolution of the administrative case will unearth "evidence that [Plaintiff] was framed" and that Plaintiff's supervisor "had abused his office to pursue his interest of removing [Plaintiff]." *Id.* at 2. According to Plaintiff, the administrative adjudicator scheduled a hearing in the case for September 2024. Nearly six months have elapsed since, and the Court has not received any further communication from Plaintiff regarding the timing of the hearing nor the status of the administrative appeal. Moreover, Plaintiff does not indicate that he anticipates any new evidence of discrimination will come to light, merely that he was in some way "framed." *Id.* at 2. With no indication as to if and when the administrative

proceeding has concluded or will conclude, nor how its resolution could be relevant to the disposition of this case, the Court will deny Plaintiff's motion.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  Plaintiff's motion to postpone is DENIED.

A separate implementing Order will issue.

Dated: <u>March 25, 2025</u>

/s/

Brendan A. Hurson
United States District Judge

23